FILED

FEB - 8 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| BOB IRVIN ADDISON, SR. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No.: 3:10-cv-182 |
| | ) |
| WILLIAM R. BRINKMAN, et al., | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION

On March 19, 2010, Plaintiff Bob Irvin Addison, Sr. ("Addison") filed in this Court an

action against Defendants William R. Brinkman ("Brinkman") and Harold Brown ("Brown")

(collectively "Defendants"). Addison alleges that Brinkman, a former Surry County Deputy

Sheriff, maliciously prosecuted Plaintiff, and violated Plaintiff's rights against illegal search and

seizure. Addison further alleges that Brown, the former Surry County Sheriff, failed to train or

supervise Brinkman, resulting in the violation of Plaintiff's constitutional rights. The matter now

comes before this Court on Defendants' Motions for Summary Judgment. The parties have fully

briefed and argued the motions, and the matters are ripe for disposition. For reasons set forth

below, this Court hereby grants Brown's Motion for Summary Judgment, and denies Brinkman's

Motion for Summary Judgment.

### *Jurisdiction and Venue*

Addison brought this action to redress alleged deprivations of rights afforded to him by

the United States Constitution, 42 U.S.C. § 1983, and the common law of Virginia. The Court

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has

supplemental jurisdiction over Addison's state law claim pursuant to 28 U.S.C. § 1367.

A substantial part of the events that gave rise to Addison's claims occurred in Surry County, Virginia. Surry County is located within the Eastern District of Virginia. Therefore, venue properly lies in this Court under 28 U.S.C. § 1391.

*Factual Background*

The claims in this matter arise out of Defendants' investigation of Addison for his suspected role in the purchase and distribution of cocaine. The undisputed facts of this case can be summarized as follows. In the months leading up to October 2006, Deputy Brinkman collected evidence against Addison through the use of confidential informants and undercover surveillance. Based upon this evidence, Brinkman obtained two capiases ordering Addison's arrest, and a warrant to search Addison's place of business. On October 2, 2006, Brinkman arrested Addison, and searched the grocery Addison owned. The grand jury then issued a true bill with additional charges against Addison.

Addison and Defendants propose battling narratives regarding Brinkman's conduct throughout the investigation, and whether he properly obtained probable cause to search and arrest Addison. In short, Addison alleges that Brinkman repeatedly manufactured evidence in his pursuit of a conviction. The parties' factual disputes are set out in depth below.

1. Brinkman's investigation of Addison

In March 2005, Deputy Brinkman opened an investigation into Addison's possible involvement with the illegal drug trade. Brinkman Mot. Summ. J., Ex. 1A-1, DEA Investigative Reports 1. Brinkman conducted this investigation as a member of a Drug Enforcement Agency ("DEA") joint task force. *Id.* Over the next several months, Brinkman developed his case against Addison through contacts with several informants. Brinkman Mot. Summ. J., Ex. 1-E, Search Warrant ("Warrant") 3.

On January 24, 2006, task force agents equipped two confidential sources with video and electronic transmission devices in order to record a social gathering that agents expected Addison to attend. Brinkman Mot. Summ. J., Ex. 1A-2, DEA Investigative Reports 4-5. This party was to take place at the Elberon, Virginia residence of Wanda Judkins ("Judkins"), a mutual acquaintance of Addison and the confidential sources. *Id.* at 4. Brinkman, along with Task Force Agents Darden and Booth, followed the confidential sources to the Judkins residence, and conducted undercover surveillance of what followed. *Id.* at 4-5.

The video recording of the party depicts Addison arriving at the Judkins residence with what he refers to as "white stuff." Brown Reply, Ex. 2, Digital Recording. Addison appears to inhale the substance repeatedly, and he welcomes the other partygoers to join him. *Id.* He references his personal use of cocaine, and its effect on his physiology. *Id.*

One confidential source collected a sample of the "white stuff" in a napkin. Brinkman Mot. Summ. J., Ex. 1A-2, DEA Investigative Reports 8. After leaving the party, the source turned the napkin and its contents over to task force officers. Pl.'s Opp'n to Brown Mot. Summ. J. ("Opp'n to Brown"), Ex. 8, Report of Drug Property Seized. Brinkman maintained temporary custody of the evidence at the Surry County Sheriff's Office. *Id.* He then packaged the sample in a DEA evidence bag, transported it to a DEA office, weighed it, and mailed it to the regional laboratory. *Id.* The lab detected the presence of 0.082 grams of cocaine hydrochloride in the sample. Opp'n to Brown, Ex. 9, Laboratory Report.

On September 26, 2006, a Surry County Grand Jury indicted Addison for knowing and intentional distribution of cocaine, a Schedule II drug. Brinkman Mot. Summ. J., Ex. 1C, Indictment. The Grand Jury issued two capiases for Addison's arrest. Brinkman Mot. Summ. J., Ex. 1D, Capias. Additionally, Brinkman sought and received a warrant to search Addison's

Grocery and curtilage for any items associated with the distribution or manufacture of cocaine. Warrant 2. In his warrant affidavit, Brinkman stated that "numerous reliable sources of information" had "frequently witnessed [Addison] distribute cocaine hydrochloride from [Addison's Grocery]." *Id.* at 3. Informants had also "witnessed cocaine hydrochloride being stored in various locations" within the store. *Id.* Brinkman described one of his confidential sources as having maintained a four-year relationship with Addison, and described three other sources as dependable Surry County/Virginia State Police informants. *Id.*

Addison has submitted affidavits from himself and others that cast events in a far different light. Addison claims, in essence, that Brinkman had a personal vendetta against him, and that he would stop at nothing to convict Addison for drug crimes. *See, e.g.*, Opp'n to Brown, Ex. 1, Aff. of Bob I. Addison, Sr. ("Addison Aff.") ¶ 3 (stating that Brinkman "would appear any time, day or night" to watch and photograph Addison at his home or business). An affidavit from Brinkman's ex-wife affirms that Brinkman "had extreme animosity toward Bob Addison." Opp'n to Brown, Ex. 15, Aff. of Tammy Brinkman ¶ 2. Another affiant claims that Brinkman offered her $500 to place "packages" in Addison's home and place of business. Opp'n to Brown, Ex. 3, Aff. of Sharon Edwards.

Addison asserts that he knew Brinkman had sent a confidential source to the party at Judkins's home. That confidential source, identified as Carrie Chapman ("Chapman"), was allegedly a "well known informant in the County." Addison Aff. ¶ 5. "Anticipating that Brinkman was orchestrating the rendezvous," Addison decided to "stage cocaine use that evening." *Id.* Addison "assum[ed] Brinkman would crash the party, find no illegal drugs, be embarrassed and finally leave [Addison] alone." *Id.* According to Addison, Judkins cooperated in perpetrating the hoax, and the substance masquerading as cocaine was, in fact, aspirin. *Id.*

4

Judkins's deposition testimony affirms Addison's account of the party. Judkins testified that Chapman was a "certified snitch," Opp'n to Brown, Ex. 5, Judkins Dep. ("Judkins Dep.") 33:1-2, and that Addison and Judkins had "put on an act—a little show for her." *Id.* at 34:8-11. The sham cocaine was, according to Judkins, merely aspirin and baking soda. *Id.* at 35:1-5.

Julie Williams is the confidential source that Brinkman described in his warrant affidavit as having maintained a four-year relationship with Addison. Williams claims she met Brinkman in Surry County Court while she awaited arraignment for failure to appear at a prior court proceeding. Opp'n to Brown, Ex. 11, Aff. of Julie Williams ("Williams Aff.") 1. Brinkman allegedly interrogated Williams in a private room, but Williams did not provide the type of information that Brinkman wanted to hear. *Id.* According to Williams, Brinkman threatened to ensure that Williams went to jail and lost her child unless she offered damaging testimony against Addison. *Id.*; Opp'n to Brown, Ex. 12, Williams Dep. ("Williams Dep.") 18: 4-15. Brinkman had Williams write and rewrite letters implicating Addison until they were as Brinkman wanted. Williams Aff. 1. Brinkman would also record, erase, and re-record taped conversations with Williams "until it was exactly the way he wanted." *Id.*; *see also* Williams Dep. 72:3-15 ("[I]f there was anything he didn't like, he would stop it and erase it and make me do it over again."). Williams asserts that she never knew Addison to use, buy, or sell drugs, and that she provided false statements against him under pressure from Brinkman. Williams Aff. 1.

Williams's affidavit and deposition testimony also address the cocaine that task force agents recovered from Judkins's party. Williams claims that Brinkman told her he knew of the aspirin ruse, and that he had personally switched the sample to cocaine before sending it to the lab in order to "bust" Addison. *Id.* at 2; Williams Dep. 43:1-11.

2. Brinkman's removal from the DEA task force

On May 19, 2006, four months after the Judkins party, two DEA agents met with Sheriff Brown to discuss Brinkman's conduct as a task force member. Brown Mot. Summ. J., Ex. 4, Brown Dep. ("Brown Dep.") 8:5-15. The agents informed Brown that Brinkman had violated DEA policy by executing an undercover operation with an insufficient number of agents present. *Id.* at 9:4-9. Brinkman then falsified an investigative report by representing that the required number of agents had been present. *Id.* Brinkman had also failed to search an informant and the informant's vehicle prior to an operation. Opp'n to Brown, Ex. 16, Brown Memorandum. After the meeting, Brown recalled Brinkman from the DEA task force. *Id.*

3. Brinkman's search of Addison's Grocery

On October 2, 2006, Brinkman went to Addison's Grocery to arrest Addison on two capiases, and to execute a search warrant. Brinkman was accompanied by Surry County Deputy Sheriff Shelle Switzer ("Switzer") and by Kevin Powers ("Powers"), a Virginia State Police Officer. Brinkman Mot. Summ. J., Ex. 2, Brinkman Dep. ("Brinkman Dep.") 11:15-17.[1] Upon arriving, Switzer and Brinkman entered the premises while Powers waited outside. *Id.* at 11:18-24. The two officers walked to the back office where they found Addison seated at a desk. *Id.* at 16:5-11. Addison's assistant, Allison Wright ("Wright"), was also in the office, counting money. *Id.* Brinkman told Addison that he had "two indictments for him and a search warrant . . . ." Brinkman Mot. Summ. J., Ex. 1A-2, Police Report 35. Addison was in the process of counting the weekend's receipts in order to make a 2:00 p.m. bank deposit. Addison Aff. ¶ 8. The officers allowed him to remain at his desk to complete the task. *Id.*

---

[1] Both defendants have submitted portions of the Brinkman deposition from August 17, 2010. *See* Brinkman Mot. Summ. J., Ex. 2; Brown Mot. Summ. J., Ex. 2. All further references to this deposition are cited as "Brinkman Dep."

From this point onwards, the witnesses' accounts vary substantially. Brinkman claims that he saw Addison's hand go down to his side and make a "furtive" movement. Brinkman Dep. 20:5-21:19. He then saw Addison stomp his foot two or three times. *Id.* at 20:7. Brinkman positioned himself behind Addison, and pulled Addison away from the desk. *Id.* at 20:7-9. At that point, Brinkman saw a Mountain Dew cup on the ground nearby. *Id.* at 20:10-12. Brinkman bent down, picked up the cup, and set it upon the desk. *Id.* at 23:10-14. The cup held a clear plastic sandwich bag that contained white sediment. *Id.* at 24:12-21. Brinkman contends that he never searched or touched Addison. *Id.* at 18:4-8.

Addison recalls events differently. He claims that Brinkman disappeared back into the main store after arriving in the back office. Addison Aff. ¶ 9. Minutes later, Brinkman reappeared in the office doorway and said, "What are you stomping?" *Id.* Brinkman positioned himself behind Addison, and directed him up from his chair. *Id.* Brinkman then patted Addison's shirt pocket and hands, and shoved his fingers into Addison's shirt and pants pockets. *Id.*; Opp'n to Brown, Ex. 2, Addison Dep. ("Addison Dep.") 63:10-15. Brinkman then directed Switzer to search Addison. *Id.* at 63:15-18.[2]

After Switzer completed her search, Brinkman told Switzer and Addison to move around to the front of the desk area where Wright was seated. *Id.* at 63:22-25. Brinkman lowered himself behind the desk and out of view. Addison Aff. ¶ 11. After approximately one minute, Brinkman arose holding the Mountain Dew cup, with a clear plastic bag hanging over the rim. *Id.* Brinkman set the cup down, and started picking up large specks of what he said was cocaine

---

[2] Allison Wright has also testified that both Switzer and Brinkman searched Addison. Opp'n to Brown, Ex. 4, Wright Dep. 27:12-15.

off the floor. Addison Dep. 64:20-23. Addison claims that he possessed no cocaine in the office. *Id.* at 66:8-11.

Switzer's account differs from those of Brinkman and Addison. Switzer testified that, unlike Brinkman, she did not see Addison do anything with his hands at his desk, nor did he "go below the desk with his hands." Opp'n to Brown, Ex. 14, Switzer Dep. ("Switzer Dep.") 75:9-22.[3] Switzer never saw Addison stomping his foot under his desk. *Id.* at 19:17-21.

Switzer also claims that before Brinkman found the Mountain Dew cup, he asked Switzer to get Addison up from the desk, and pat him down for weapons. *Id.* at 18:8-20.[4] When Switzer came around the desk, she saw the cup from four or five feet away. *Id.* at 18:21-19:13. Switzer has testified that she did not see a plastic bag inside of the cup. *Id.* at 19:8-10.

Switzer confirms that Brinkman went down upon his hands and knees when he searched around Addison's desk. *Id.* at 90:4-22. At one point, the cup was concealed from Switzer's view "by the things [Brinkman] was doing as he was searching." *Id.* at 91:2-9. Switzer was concerned enough by what she witnessed that she later told another officer she thought it was "possible" that Brinkman had planted the drugs in the cup. *Id.* at 119:5-17.

After Brinkman completed his search around Addison's desk, Powers entered the office to conduct an ion test[5] of surfaces in and around the building. The parties offer competing versions of how the ion testing occurred. Powers has stated that after he was led into the office, Brinkman told him to test the floor area around the desk. Opp'n to Brown, Ex. 20, Powers Dep.

---

[3] Each of the parties has submitted portions of the Switzer deposition from August 3, 2010. *See* Brinkman Mot. Summ. J., Ex. 4; Opp'n to Brown, Ex. 14; Brown Reply, Ex. 3. All further references to this deposition are cited as "Switzer Dep."

[4] Switzer has testified that she does not believe Brinkman ever touched Addison. Switzer Dep. 23:3-13.

[5] An ion testing device utilizes ion mobility spectrometry to detect the presence of narcotics in a sample. Brown Mot. Summ. J., Ex. 6, Powers Dep. 7:12-25.

("Powers Dep.") 11:12-20.[6] The floor area tested positive for cocaine at 14.62 times the casual contact level. *Id.* at 19:4-17.[7] Powers tested Addison's hands, pants, and pockets, and he tested a desk drawer. *Id.* at 25-28. These surfaces also tested positive at roughly 15 times the normal contact level. *Id.*

Addison opened his safe for the officers. *Id.* at 29:21-22. According to Powers, "no one touched inside the safe." *Id.* at 30:9-12. Samples from inside the safe detected the presence of cocaine at three to nine times the casual contact level. *Id.* at 30-31.

Lastly, Powers went outside and tested two trucks and a boat belonging to Addison. *Id.* at 31-35. Surfaces in all three vehicles tested positive for cocaine at eight to 15 times the normal contact level. *Id.* Powers has stated that Brinkman did not enter any of the vehicles prior to ion testing. *Id.* at 31:21-23; 33:15-19; 35:7-10.

Addison claims that Brinkman touched all of the tested surfaces prior to ion testing. Powers tested Addison's hands and pockets "in the exact places that Brinkman had touched [him]." Addison Aff. ¶ 11. After Addison opened the safe, Brinkman immediately pulled Addison away and "dived into that thing." Addison Dep. 77:13-19. Addison was not present when Powers tested Addison's vehicles, but his brother was. William Addison has sworn in an affidavit that he saw Brinkman "search and touch certain areas of each of these vehicles" before

---

[6] Each of the parties has submitted portions of the Powers deposition from August 3, 2010. *See* Brown Mot. Summ. J., Ex. 6; Opp'n to Brown, Ex. 20; Brinkman Mot. Summ. J., Ex. 3. All further references to this deposition are cited as "Powers Dep."

[7] An ion test may detect cocaine in unexpected places. For example, Powers estimates that 90 percent of United States currency carries traces of cocaine residue. Powers Dep. 17:21-23. "Casual contact level" refers to the baseline against which the ion test results are measured—the amount of cocaine on a dollar bill, "the dirtiest thing out there." *Id.* at 27:6-16.

having Powers test "each of the areas he'd just touched." Opp'n to Brown, Ex. 21, Aff. of William H. Addison, Jr. ¶ 3.

4. Additional charges and dismissal of the case against Addison

Brinkman arrested Addison on the same day he conducted the search of Addison's Grocery. Addison Aff. ¶ 13. The police released Addison on bond. *Id.* Brinkman claims that, on Friday, October 13, 2006, he received a phone call from Judkins regarding an attempt by Addison to contact her. Brinkman Reply, Ex. F, Brinkman Report and Judkins Statement 1. Judkins allegedly provided a signed statement on the same day. *Id.* at 3. After Brinkman briefed Sheriff Brown on the situation, the Sheriff's Department placed Judkins in "a safe place" for the weekend. *Id.* at 2.

In her October 2010 deposition, Judkins denied writing or signing any statement. Brinkman Reply, Ex. E, Judkins Dep. 15-17. She claims Brinkman told her that Addison had "put out a contract" on her life, and that any purported threats were "something that Brinkman brought to [her] attention, him and him only." *Id.* at 21:1-8.

On January 23, 2007, a Surry County Grand Jury indicted Addison for knowingly and intentionally possessing cocaine with intent to sell or distribute. Brinkman Mot. Summ. J., Ex. 1G, Indictments. This charge arose out of the October 2, 2006 search of Addison's Grocery. *Id.* The grand jury also indicted Addison for attempting to intimidate or impede a witness in a case pending in the Surry County criminal courts. *Id.* This latter charge arose out of Addison's alleged threats against Judkins.

The Honorable W. Parker Councill, then serving as the Commonwealth's Attorney for Isle of Wight County, was appointed special prosecutor in the Addison matter. Brinkman Mot. Summ. J., Ex. 5, Councill Aff. ("Councill Aff.") ¶¶ 2, 4. In December 2007, Brown elected not

to reappoint Brinkman as a Surry County Deputy Sheriff. Brown Dep. 20:16-20. Brown did not

reappoint Brinkman because Brinkman had disobeyed an order during the investigation into

Michael Vick's dog-fighting activities. *Id.* at 20-21. At some point thereafter, Brown met with

Councill, and the two agreed that the Commonwealth's Attorney should *nol prosse* the Addison

case. Councill Aff. ¶¶ 5-7. Councill and Brown have emphasized that the decision had nothing

to do with any allegations of misconduct against government witnesses. *Id.* at ¶ 7; Brown Dep.

28-29. The Circuit Court for Surry County issued an Order of *Nolle Prosequi* on March 25,

2008. Opp'n to Brown, Ex. 24, *Order of Nolle Prosequi.*

In March 2010, Addison filed a federal lawsuit in the United States District Court for the

Eastern District of Virginia. The matter comes now before this Court on Defendants' Motions

for Summary Judgment.

*Analysis*

1. Standard of review

A court may grant summary judgment only if the movant shows "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56. The party seeking summary judgment "bears the initial responsibility of informing

the district court of the basis for its motion," and demonstrating the absence of a dispute of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a

showing, the party opposing the motion must set forth specific facts, supported by the record,

demonstrating that "the evidence presents a sufficient disagreement to require submission to the

jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party asserting that a

fact cannot be or is genuinely disputed must support that assertion by citing to materials in the

record, including depositions, documents, and affidavits, or by demonstrating that the materials

11

cited by the opposing party do *not* establish the presence or absence of a genuine dispute. FED. R. CIV. P. 56. If a party relies upon affidavits in support of its assertions, those affidavits must not be conclusory or based upon hearsay. *Carpenter v. Carroll, Pinto, Inc.*, 374 F. Supp. 2d 487, 491 (E.D. Va. 2005) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)).

### 2. Addison's claims against Brinkman

In order to succeed on any of his three claims against Brinkman, Addison must prove that Brinkman lacked probable cause to search and arrest him. In Count I, Addison alleges that Brinkman arrested him without probable cause in violation of the U.S. Constitution. Second Am. Compl. ¶ 38. Addison alleges in Count II that Brinkman maliciously prosecuted him in violation of the U.S. Constitution. *Id.* at ¶ 42. Such a claim requires the plaintiff to prove "at least" four elements: "(1) the initiation or maintenance of a criminal proceeding; (2) favorable termination of that proceeding; (3) *lack of probable cause* to support that proceeding; and (4) a wrongful seizure flowing from that proceeding." *Snider v. Seung Lee*, 584 F.3d 193, 203 (4th Cir. 2009) (Stamp, J., concurring) (emphasis added). Count III is a state law claim for malicious prosecution. Am. Comp. ¶ 44. In Virginia, the plaintiff in a malicious prosecution action must prove that the prosecution was "(1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) *without probable cause*; and (4) terminated in a manner not unfavorable to the plaintiff." *Hudson v. Lanier*, 497 S.E.2d 471, 473 (Va. 1998) (emphasis added). At this stage, Defendants only contest the "probable cause" element of these torts.

"Probable cause exists where the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed,

12

and that evidence bearing on that offense will be found in the place to be searched." *Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2639 (2009) (quotations omitted). Defendants assert that the undisputed facts establish Brinkman's probable cause to arrest Addison and to search his place of business. In their memoranda, Defendants draw the Court's attention to the undercover surveillance operation from January 2006, which led to two grand jury indictments and capiases for arrest. Defendants emphasize that Brinkman possessed a search warrant, supported by affidavit and issued by a neutral magistrate. Furthermore, as Defendants argue, even if one assumes that Brinkman planted drugs in the cup beside Addison's desk, Addison's third drug charge was supported by independent probable cause: ion testing of 14 samples revealed that Addison lived "in a veritable dust storm of cocaine."

The hitch for Defendants is that Addison—armed with affidavits and deposition testimony—challenges much of what Defendants rely upon as establishing probable cause. With regard to the first set of drug charges, Addison and Judkins have sworn under oath that what appeared to be a coke party was merely a practical joke aimed at Brinkman. According to Julie Williams's testimony, Brinkman knew that he was the subject of Addison's prank, and he responded by planting cocaine in the sample that task force agents recovered from the party. Williams, who appears to be Brinkman's key source for his warrant affidavit, also claims that the information she provided regarding Addison's illegal activities was false and given under duress. Assuming the facts are as Addison alleges them to be, this Court could not hold as a matter of law that the original drug charges or the search warrant were supported by probable cause.

The additional drug charge from January 2007 arose out of the October 2, 2006 search. Addison claims that there he possessed no drugs on the premises, and that Brinkman touched various surfaces prior to ion testing. Addison's brother supports this assertion. Switzer has

13

stated that she did not see in a soda cup the cocaine that Brinkman later claimed to find. Switzer was concerned that Brinkman may have planted the evidence. With respect to the charge for threatening a witness, the victim, Judkins, now denies providing the statement to Brinkman that served as the basis for that charge. Again, assuming the validity of these allegations, the Court could not hold that the facts establish probable cause in support of Brinkman's actions.

Perhaps in recognition of this problem, Defendants contend that even if Addison's affidavits and depositions demonstrate the existence of a material factual dispute, the scenario he proposes is simply too fantastical for a jury to believe. In other words, Defendants ask this Court to grant summary judgment on the grounds that Addison and his witnesses are not credible.

As a general rule, where the nonmoving party would, at trial, carry the burden of proof, that party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted," and "all internal conflicts in it resolved favorably to him." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (citing 10 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2713, at 406-10, § 2716, at 431-32). Determinations as to the truthfulness of an affidavit are reserved for the trier of fact. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986); *cf. Davis v. Zahradnick*, 600 F.2d 458 (4th Cir. 1979) (summary judgment is inappropriate when affidavits require credibility determinations). The policy behind this rule is well-established. In the summary judgment phase, a judge has only his or her faculties of reasoning and logic to aid in assessing the credibility of a witness. A jury's credibility determinations are, by contrast, illuminated by the full crucible of the trial process. The finder of fact observes the witness as he delivers his testimony, and as he defends his account against cross-examination. The witness's appearance and manner may act as the "complete antidote" to the substance of his testimony, allowing the jury to glimpse "his

14

hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration." *Arnstein v. Porter*, 154 F.2d 464, 470 (2d Cir. 1946) (quotations omitted). The usefulness of an affidavit or deposition pales in comparison—it is "the dead body of the evidence, without its spirit." *Id.*

Courts have, in rare and extreme instances, diverged from this well-worn judicial path. *See, e.g., Yeatman v. Inland Prop. Mgmt., Inc.*, 845 F. Supp. 625, 629 (N.D. Ill. 1994) (granting summary judgment where non-moving party's factual assertions "unduly strained credulity"). A court may grant summary judgment notwithstanding testimony from a nonmoving party, if that testimony is "utterly implausible in light of all relevant circumstances." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998); *cf. Losch v. Borough of Parkesburg*, 736 F.2d 903, 909 (3d Cir. 1984) (holding that "conflicts of credibility should not be resolved on . . . summary judgment unless the opponent's evidence is too incredible to be believed by reasonable minds") (quotation omitted). Testimony that is "contrary to a law of nature," *Chavin*, 150 F.3d at 728, or raises only "metaphysical doubt" falls into this category of dubious materials, which, by themselves, cannot stave off summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Supreme Court offered insight as to the parameters of this exception in *Scott v. Harris*, 550 U.S. 372 (2007). In *Scott*, the plaintiff was a motorist who alleged excessive use of force after a deputy drove him off the road during a high-speed chase. *Id.* at 375-76. The plaintiff claimed that, contrary to the defendants' assertions, he remained in control of his vehicle, and did not endanger any drivers or pedestrians during the pursuit. *Id.* at 379. The Court of Appeals accepted the facts as alleged by the plaintiff, and upheld the district court's denial of the defendants' motion for summary judgment. *Id.*

15

The Supreme Court reversed, recognizing that while a court ruling on summary judgment should typically adopt the plaintiff's version of the facts, this case contained "an added wrinkle"— "existence in the record of a videotape capturing the events in question." *Id.* at 378. The videotape showed plaintiff's vehicle careening down narrow roads in the dead of night, swerving around other cars, and running red lights. *Id.* at 379. The Court observed that the videotape "quite clearly contradicts the version of the story told by respondent," and that there were "no allegations or indications that [the] videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Id.* at 378.

The Court concluded that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. If one party's version of events "is so utterly discredited by the record that no reasonable jury could have believed him," summary judgment is appropriate. *Id.*

Having considered the circumstances of the present case, with due regard for the applicable legal standards, this Court must deny Brinkman's Motion for Summary Judgment. In so doing, the Court is cognizant of the apparent defects and contradictions in Addison's version of events. To succeed on his legal claims, Addison may need to convince a trier of fact to accept the latest testimony of Judkins and Williams, and disregard prior inconsistent statements both women made to police. Addison may also need to convince a trier of fact that what appears on videotape to be a cocaine party was, in fact, an attempt to trick narcotics detectives into believing that partygoers were committing a serious crime. If Addison attempts to assail the integrity of the ion testing, Brinkman can counter with the testimony of himself, Powers, and Switzer.

16

Notwithstanding these issues, this Court is not satisfied that the testimony proffered by Addison is "utterly implausible in light of all circumstances" or "too incredible to be believed by reasonable minds." The affidavits and deposition testimony cited by Addison do not buck the laws of nature, nor do they germinate only "metaphysical doubts." *Scott*, cited by Defendants, is distinguishable from the case at bar. The *Scott* Court had before it a videotape that directly contradicted the plaintiff's version of events. One could not believe both the plaintiff's account and the video's depiction of the high speed pursuit. In the present case, Addison has offered a narrative that is consistent with what appears on the video recording.

There are, furthermore, undisputed factual allegations in the record that lend an additional measure of credibility to Addison's account. Brinkman ran afoul of DEA regulations during the course of a drug investigation, and Sheriff Brown removed him from the task force. Brown did not reappoint Brinkman as a deputy after Brinkman disobeyed a direct order in a subsequent investigation. Switzer, a fellow deputy, believes that Brinkman may have planted drugs in Addison's office. These facts suggest that Addison's version of events does not rise to the level of "utter implausibility."

In concluding, it bears emphasizing once more that "trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962). In all but the most exceptional cases, a court ruling on a summary judgment motion may not substitute its own credibility judgments for that of the triers of fact. "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." *Id.* The circumstances present in this case do not justify this Court in wresting away that which properly lies within the jury's province. Defendant Brinkman's Motion for Summary Judgment is denied.

3. Addison's claims against Sheriff Brown

Addison has asserted two claims against Sheriff Brown in his official[8] and individual capacity. Second Am. Compl. ¶ 10. In Count IV of his Complaint, Addison alleges that Brown failed to train Brinkman, and that Brinkman's violations of Plaintiff's rights directly resulted from this failure. *Id.* at ¶ 61. In Count V, Addison alleges that Brown improperly supervised Brinkman, and that this failure also directly resulted in Brinkman's unconstitutional conduct. *Id.* at ¶ 74. The Court will address each claim in turn.

a. Failure to train

In order to succeed on a failure to train theory, a plaintiff must prove that: "(1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a deliberate indifference to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 701-702 (E.D. Va. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-92 (1989)). A plaintiff can demonstrate "deliberate indifference" in two ways: (1) by showing that the supervisory power was "actually aware" that subordinates were regularly violating constitutional or statutory rights, but failed to implement a training program in response to the pattern of misconduct; or (2) by showing that the supervisory power failed to train its employees "concerning an obvious constitutional duty that the particular employees are certain to face." *Brown*, 308 F. Supp. 2d at 703-4 (citing *Harris*, 489 U.S. at 390). In order to satisfy the

---

[8] "A claim against a government employee in his official capacity is tantamount to a claim against the government entity for which he works." *Hill v. Robeson Cnty.*, --- F. Supp. 2d. ---, 2010 WL 2104168, at *3 (E.D.N.C. May 20, 2010). The Surry County Sheriff's Department is, therefore, a defendant in this matter. Sheriff Alvin Clayton was automatically substituted as a defendant at the time he assumed the office of Surry County Sheriff. FED. R. CIV. P. 25(d).

"causation" element, the plaintiff must identify a specific deficiency in training, and demonstrate the direct causal link between that deficiency and the ultimate injury alleged. *Buffington v. Baltimore Cnty.*, 913 F.2d 113, 122 (4th Cir. 1990) (citing *Harris*, 489 U.S. at 391).

In support of his failure to train claim, Addison alleges that Brown "conducted no training or inadequate training of Deputy Brinkman in the areas of proper procedures of the handling of drug evidence and the obtaining of search warrants." Second Am. Compl. ¶ 50.[9] Addison utterly fails, however, to identify any specific deficiency in training, and demonstrate how that deficiency directly caused the ultimate injury alleged. *Buffington*, 913 F.2d at 122. The record shows that Brinkman received extensive training, as required by law. He attended basic training at the Crater Criminal Justice Academy. Brinkman Dep. 51:5-15. He received biannual continuing education courses at the academy. *Id.* at 51:16-20. Brinkman also attended supplemental training on special topics relating to narcotics investigations, and received DEA training on undercover investigations and drug interdiction. *Id.* at 52. Nowhere in his pleadings does Addison offer any factual allegations to impugn the quality or breadth of Brinkman's training, nor does he attempt to explain how any such deficiency resulted in Addison's alleged constitutional injuries. Therefore, there is no issue of material fact as to whether Brown failed to train Brinkman. Defendant Brown's Motion for Summary is granted as to Count IV.

b. Failure to supervise

In order to establish liability for failure to supervise, a plaintiff must prove: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct

---

[9] In his Complaint, Addison alleges that Brown had no established procedures or protocols with respect to the handling of seized narcotics. Second Am. Comp. ¶ 53. Addison offers these allegations in support of both Count IV for failure to train and Count V for failure to supervise. Any purported defects in the Surry County Sheriff's drug custody system cannot be properly characterized as a "failure to *train*." The Court therefore addresses these allegations in its discussion of Count V.

that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (quotations omitted). To satisfy the "knowledge" requirement, a plaintiff must establish (1) that the conduct at issue was "widespread, or at least has been used on several different occasions," and (2) "that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (quotations omitted). The plaintiff cannot ordinarily satisfy this burden by "pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (citing *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)). A supervisor cannot, moreover, "reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Slakan*, 737 F.2d at 373.

Addison offers two arguments in support of his claim for failure to supervise. First, Addison asserts that Brown's May 2006 meeting with DEA agents put him on notice that Brinkman was engaged in conduct that posed a risk of constitutional injury. According to Addison, Brown's failure to investigate the allegations and discipline Brinkman resulted in Brinkman violating Addison's constitutional rights. Second, Addison argues, Brown knew there was "no mechanism or procedure in place which provided any accountability for the handling of illegal narcotics seized by Surry Sheriff's Deputies." Opp'n to Brown 25. Had Brown instituted a different policy, the constitutional harms to Addison would not have occurred.

20

Both of Addison's arguments fail under the first *Shaw* element—Brown had no actual or constructive knowledge that Brinkman was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury. Indeed, the record is devoid of any allegations, aside from Addison's, that Brinkman ever planted or manufactured evidence. *See* Brown Dep. 35:20-23 (stating that Addison's drug-planting allegation was the first against Brinkman). Because Brinkman had no history of engaging in this type of misconduct, Brown was not on notice of any such danger that Brinkman posed.

Addison claims that once DEA agents informed Brown of Brinkman's violations, Brown should have known that Brinkman was a threat to the constitutional rights of citizens. The DEA allegations against Brinkman do not, however, satisfy the first *Shaw* element. Before a supervisor can be held liable in the failure to supervise context, the conduct of which the supervisor was aware must be of a quantity and a quality sufficient to put him on notice of the pervasive and unreasonable risk that his employee posed to the constitutional rights of others. In this case, DEA agents told Brown that Brinkman twice conducted undercover operations with an insufficient number of agents present, and that he falsified reports by representing that the requisite number of agents had participated. The agents also allege that Brinkman mishandled a cooperating source by failing to search the source's person or vehicle prior to an operation. These alleged transgressions are far more akin to "isolated incidents," *Slakan*, 737 F.2d at 373, than they are to "widespread" misconduct. *Shaw*, 13 F.3d at 799; *see also Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) ("Generally, a failure to supervise gives rise to § 1983 liability . . . only in those situations in which there is a history of widespread abuse.").

Furthermore, the prior allegations against Brinkman are not of the same character as those raised by Addison. *See Hill v. Robeson Cnty.*, --- F. Supp. 2d. ---, 2010 WL 2104168, at

21

*10 (E.D.N.C. May 20, 2010) (dismissing failure to supervise claim where plaintiff, a sexual abuse victim, alleged that defendants were aware of risk based on prior allegations not involving sexual misconduct). The DEA regulations at issue set protocol for the number of officers required for an operation, for filing reports, and for handling cooperating witnesses. While one might reasonably argue that an officer who disobeys these procedures is *more likely* than another officer to manufacture evidence, such a conclusion is not determinative under *Shaw*. *Shaw* is concerned with the absolute degree of risk that an employee poses to the constitutional rights of others. That risk must be pervasive and unreasonable. A rational sheriff in Brown's position would not conclude that, because Brinkman had chafed at DEA Standards of Conduct, he was an imminent threat to the constitutional rights of Surry County citizens.

Addison's argument regarding the absence of an effective procedure for handling seized narcotics also lacks merit. The record contains no allegations that Surry County Deputies ever mishandled illegal drugs. Prior to Addison's own allegations, Brown had no basis for knowing of any pervasive, unreasonable risk posed by the conduct of his deputies. He was not, therefore, under any legal obligation to take action. For this reason, and for reasons stated above, Brown's Motion for Summary Judgment is granted as to Count V.[10]

## CONCLUSION

A genuine issue of material fact exists as to whether Brinkman violated the constitutional rights of Plaintiff. Brinkman's Motion for Summary Judgment is, therefore, denied. No genuine

---

[10] Brown has also argued (1) that Addison's claims against him are barred by the statute of limitations, Brown Mot. Summ. J. 9-10; (2) that Brown, in his individual capacity, enjoys qualified immunity, *id.* at 18-20; and (3) that the Surry County Sheriff is not liable in his official capacity because Addison has not established that some unconstitutional official custom or policy led to Addison's injury. *Id.* at 20. The Court has granted Brown's Motion for Summary Judgment because there is no genuine issue of material fact as to whether Brown failed to train or supervise Brinkman. It is therefore unnecessary to reach Brown's other arguments.

factual dispute exists as to whether Brown failed to train or failed to supervise Brinkman.

Brown's Motion for Summary Judgment is granted. Plaintiff's claims against Brown in his

individual and official capacities are dismissed.


Alexandria, Virginia
February 8, 2011

                                                    /s/
                                        Liam O'Grady
                                        United States District Judge